IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

GREGG W. PAULSON                          §

VS.                                       §                    CIVIL ACTION NO. 6:22cv002

BRYAN COLLIER, ET AL.                     §

REPORT AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE

Plaintiff Gregg W. Paulson, a prisoner confined within the Texas Department of Criminal

Justice (TDCJ), filed this civil rights lawsuit complaining of alleged violations of his constitutional

rights while incarcerated. The case was referred to the undersigned United States Magistrate Judge

for findings of fact, conclusions of law, and recommendations for the disposition of the case.

The present Report concerns Plaintiff's amended complaint, (Dkt. #67), filed through

counsel, and Defendants' motion to dismiss, (Dkt. #79). For reasons explained below, the Court

recommends that the motion to dismiss be granted—in part—and denied in part. Ultimately, the

Court recommends that Paulson's claims under the Americans with Disabilities Act (ADA), the

Rehabilitation Act (RA), the Religious Land Use and Institutional Persons Act (RLUIPA), as well

as his First Amendment religious claim against Warden Townsend and his Fourteenth Amendment

Equal Protection claim against Wardens Boyd and Cueto should proceed before the Court.

**I. Paulson's Amended Complaint**

The operative pleading in this lawsuit is Paulson's amended complaint, (Dkt. #67).

Generally, an amended complaint entirely supersedes and takes the place of the original complaint.

*See Clark v. Tarrant Cnty., Tex.*, 798 F.2d 736 (5th Cir. 1986).

Paulson explains that he is suing for violations of (1) the Religious Land Use and

Institutional Persons Act (RLUIPA) against TDCJ, (2) the ADA and the RA against TDCJ and

1

Defendant Collier in his official capacity, and (3) the First, Eighth, and Fourteenth Amendments under 42 U.S.C. 1983 against Defendants Townsend, Sanders, Boyd, and Cueto in their individual capacities.

He first explains that he is over seventy-years old and suffers from several health issues that affect his daily life. Despite his health issues, he has been "able to attend chapel for his religion, [] has been able to attend school, and has developed trades in craft shop," (Dkt. #67, pg. 1-2). But "when TDCJ and/or Bryan Collier, as Director of TDCJ, adopted, approved, and/or implemented a policy referred to as the 'cool bed policy,' Defendants began discriminating against" him and other disabled prisoners on the basis of their medical conditions and "without reasonable accommodations."

Paulson further explains that because of his good behavior, he has the status of a "trustee." Trustees are generally permitted more privileges and opportunities inside TDCJ facilities than other prisoners because of their institutional history and good behavior. *Id*. at pg. 3. He states that he has sincerely held religious beliefs, particularly affiliation with the Dine' Traditionalist (Navajo)—as he has been a member of the Navajo Nation since the 1960s. *Id*. Paulson explains that he has regularly attended services while in the custody of TDCJ units other than the Michael Unit, as he "usually attends services on Mondays per his religious teachings and on certain sacred days," and that is attendance "at communal services is an important aspect [of] in his religious beliefs and practice," (Dkt. #67, pg. 4). He contends that he "was not permitted to attend religious services while housed at the Michael Unit of TDCJ," and if he were to return to the Michael Unit he "would not be permitted to attend religious services because of TDCJ's policies including but not limited to, the cool bed restriction policy and restrictive housing policy."[1] *Id*.

---

[1] The Court notes that the Michael Unit is one of only a handful of units that can host Native American religious services. *See Chance v. Tex. Dep't of Criminal Justice*, 730 F.3d 404 (5th Cir. 2013). Given that there is only four

He continues by noting that he is disabled under the Americans with Disabilities Act (ADA and the Rehabilitation Act (RA). Specifically, Paulson asserts that he has one or more actual disabilities—including osteoarthritis that affects his ability to walk, hypertension, hyperglycemia, long COVID-19, hematuria, and a Vitamin D deficiency, "all of which substantially limit his major life activities." *Id.* at pg. 5. He argues that he has "a record of disability" through extensive medical history, which reflect his multiple disabilities; likewise, Paulson explains that he "is regarded as disabled" because—"on information and belief, TDCJ's cool bed policy assigns points to [him] based on his age and medical condition to automatically classify [him] as needing a cool bed restriction." Paulson asserts that the cool-bed policy "and other policies treat [him] as though he is disabled based on its perception of [his] medical conditions," (Dkt. #67, pg. 5).

Prior to his transfer to the Michael Unit, Paulson states that he "participated in several programs offered by TDCJ to [him] and other inmates," and he participated in educational classes and in the craft shop where he earned income using his skills and tools. *Id.* He was permitted, prior to his transfer, to attend the chow hall like other prisoners. Paulson asserts that "[m]edical staff at UTMB confirmed that there is no reason that [he] should not be permitted to participate in the programs available to other inmates on the Michael Unit." *Id.*

Paulson elaborates on TDCJ's "cool-bed restriction" policy. He notes that he was transferred from the Estelle Unit to the Michael Unit in September 2021, one of the reasons being is that the Michael Unit is a designated Native American unit with weekly gatherings of Native American inmates, including Navajo. Navajo volunteers "come to the Michael Unit to lead special ceremonies such as cleansings and rituals." *Id.* at pg. 6. Paulson insists that "[p]risoners in the

---

male prison units—the Michael Unit, the Hughes Unit, the McConnal Unit, and the Estelle Unit—that can host such religious services, there is a possibility that Paulson could be transferred to the Michael Unit to fulfill his religious needs.

Michael Unit who are not subject to disabilities are permitted to attend school, attend the craft shop, and attend religious services.

Turning to the "restrictive housing policy," Paulson maintains that when he was moved to the Michael Unit, he was housed in Building 12 because of TDCJ's policies related to his disabilities and the cool-bed policy. By way of example, Paulson highlights that the "cool bed policy assigns points to [prisoners] based on their disabilities, and then automatically applies a cool bed restriction to those [prisoners]." Thereafter, those classified prisoners "must be housed in air-conditioned cells. Paulson insists that he was provided no notice or hearing regarding his assignment to 12 Building in the Michael Unit. *Id*.

12 Building is considered "restrictive housing, administrative segregation, or solitary confinement, and is sometimes referred to as "Ad Seg," (Dkt. #67, pg. 6). Paulson asserts that Ad Seg is governed by TDCJ's policies and enforced by the Director. When he was placed in 12 Building, Paulson maintains that he was "subject to TDCJ's policies concerning [prisoners] housed in Ad Seg," which did not meet any basic liberty interests afforded to prisoners in the same class as him. Paulson states that his removal from participation in the craft shop was "due solely due his disability," and that he lost thousands of dollars' worth of tools as a result.

Moreover, Paulson explains that TDCJ policies provided for 23 hours per day inside a cell while in "Ad seg," but his own experience was 24 hours per day—with limited trips out of his cell only to shower. *Id*. Unlike other prisoners of his status, he was not permitted to shower daily and was handcuffed while showering. *Id*. at pg. 7. Paulson further states that he was denied his medical meals and was not permitted to attend the chow hall like other prisoners not assigned to "Ad seg." Prisoners in Ad seg are denied telephone access, and they are not permitted to day-room or television access, as well as access to the law library, pursuant to several TDCJ policies. *Id*.

4

Paulson argues that he "was denied access to the general law library, law library, rehabilitation programs, and other privileges available to [prisoners] of the same class." *Id.*

Paulson further contends that the conditions inside "Ad Seg" on the Michael Unit were "deplorable." The units would often experience water leaks, insect infestations—which were found in his cell. On one weekend alone, Paulson explains that he killed 47 cockroaches.

He argues that he experienced continued discrimination even after his transfer to the Connolly Unit. Specifically, at the Connolly Unit, he "is grouped with other [prisoners] regarding by TDCJ as having disabilities and TDCJ provides them less access and opportunities than those [prisoners] who do not have disabilities in the same classification group." *Id.* at pg. 8. Paulson highlights two examples: TDCJ only permits prisoners who have disabilities one television in their day room while other prisoners have two inside the dayroom, and that he is forced to eat in a dining area with only eight chairs—despite having fourteen prisoners eating at a time, forcing Paulson and other prisoners to eat on the floor, (Dkt. #67, pg. 9). Ultimately, Paulson seeks the following relief:

> Plaintiff prays that Defendants be cited, and/or ordered to appear and answer herein, and upon a final finding of facts, Plaintiff receive a judgment against Defendants for the following:
>
> 1. Issue a finding and/or declaratory judgment that TDCJ's policies including the restrictive housing plan and the cool bed classification policy substantially interfere with Plaintiff's religious exercise and violate RLUIPA;
>
> 2. Issue a finding and/or declaratory judgment that TDCJ's policies including the restrictive housing plan and the cool bed classification policy discriminate against Plaintiff on the basis of his disability and violate the ADA and/or the RA;
>
> 3. Issue a finding that Plaintiff was discriminated against by Defendants on the basis of his disability ADA and/or the RA;
>
> 4. Issue declaratory and injunctive relief based on the Court's findings, RLUIPA, the ADA, and/or the RA as appropriate;
>
> 5. Award Plaintiff compensatory damages under the ADA, the RA, and/or § 1983;
>
> 6. Award Plaintiff punitive damages under the ADA, the RA, and/or § 1983; and

Plaintiff's Second Amended Complaint                                                Page 16

He also seeks his costs, expenses, and attorneys' fees. (Dkt. #67, pg. 16–17).

## II. Defendants' Motion to Dismiss

Defendants filed a partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). They insist that Paulson failed to state a claim upon which relief may be granted with respect to his claims under section 1983. First, they maintain that Paulson failed to state a First Amendment access to courts claim against Defendant Townsend, as they argue that Paulson's claims do not allege that he was prevented from filing in court or caused him to lose a pending case.

Defendants next seek dismissal of Paulson's Eighth Amendment conditions of confinement claim. Defendants Townsend, Cueto, and Boyd insist Paulson failed to "allege that his assignment to air-conditioned housing presented conditions that posed a substantial risk of serious harm or resulted in the denial of the minimal civilized measure of life's necessities," (Dkt. #79, pg. 7). Defendants also argue that Paulson does not allege that any of these Defendants were aware of any facts from which the inference could be drawn that a substantial risk of serious harm to him existed or that they drew the inference, or that they disregarded any risk to Paulson's harm of safety.

Next, Defendants seek dismissal of the Fourteenth Amendment due process claim against Defendants Townsend, Cueto, and Boyd because "Paulson fails to allege facts that demonstrate any atypical hardship or significant deprivation which might conceivably create a liberty interest." *Id.* at pg. 9. Finally, Defendants contend that Paulson's claims for compensatory and punitive damages are barred because Paulson failed to allege any physical injury and that Defendants are entitled to qualified immunity.

### III. Paulson's Response

Through counsel, Paulson filed a response, (Dkt. #83), in opposition to the motion to dismiss. First, Paulson maintains that he was harmed by Defendant Townsend's "delay and denial of access to legal materials and services," a delay of his "ability to respond and prosecute his request for injunctive relief." By the time he could prosecute that claim, Paulson insists, "he had been transferred and no longer needed the specific relief requested as a result of the transfer," (Dkt. #83, pg. 4). He insists that "the pleadings in this case show actual injury," because he was "forced to endure inhumane conditions of administrative segregation for much longer than if he had been able to prosecute his request for a preliminary injunction." *Id*.

Second, Paulson argues that his Eighth Amendment claim should not be dismissed because "the denial of exercise and recreation can form the basis for an Eighth Amendment claim," and the abhorrent conditions inside the prison presented the denial of the minimal civilized measure of life's necessities, given the conditions—including insect infestations. He also stresses that even after his transfer to a different unit, unlike other prisoners, he was "not even afforded a place to eat" since he was forced to sit on the floor. He claims that Defendants Boyd and Cueto "continued to deny Plaintiff recreational activities afforded to other inmates." *Id*. at pg. 4. Paulson states that he alleged how Defendants Townsend, Cueto, and Boyd were personally involved, as Defendant Townsend "was specifically aware of [Paulson's] request to transfer from the abhorrent conditions in administrative segregation and refused, without any due process consideration of the deplorable conditions Plaintiff faced." *Id*. Moreover, Defendants Body and Cueto were not only aware of the conditions but refused to correct them after Paulson complained.

Third, Paulson claims that his Fourteenth Amendment claim is sufficient because his placement in administrative segregation "imposed atypical and significant hardship," particularly

because of the "horrible conditions" and denial of access to medically assigned meals. His placement in administrative segregation also caused him to lose property and income. Paulson insists that the deprivation of his property was without due process—as Defendant Brown deprived him of access to the craft shop and then destroyed his tools. Paulson also contends that his request for compensatory damages and punitive damages are not barred by the Prison Litigation Reform Act (PLRA).

## IV. Defendants' Reply and Paulson's Sur-Reply

Defendants argue that Paulson failed to allege facts that his status as a litigant was prejudiced as a result of delay or only being able to request nine legal cites per week while in jail. They also insist that "awareness of a request to transfer from administrative segregation does not amount to subjective knowledge of a substantial risk of serious harm" under the Eighth Amendment. Defendants also argue that Paulson's conclusory labels of "mistreatment," "deplorable conditions," and "abhorrent," do not raise a right to relief beyond the speculative level. Finally, for brevity purposes, Defendants insist that Paulson had failed to allege that he suffered a physical injury of any kind, which precludes his recovery of compensatory damages for mental injuries.

In response, Paulson insists that the factual allegations are sufficient for all his claims. Paulson argues that Defendants failed to address many of his allegations, particularly his property claims. He also contends that he pleaded personal involvement.

## V. Legal Standards

The United States Court of Appeals for the Fifth Circuit has observed that motions to dismiss under Rule 12(b)(6) are "viewed with disfavor and rarely granted." *See Turner v. Pleasant*,

663 F.3d 770, 775 (5th Cir. 2011).  Such motions are generally evaluated on the pleadings alone. *See Jackson v. Procunier*, 789 F.2d 307, 309 (5th Cir. 1986).

Nevertheless, Federal Rule of Civil Procedure 12(b)(6) permits dismissal if a plaintiff "fails to state a claim upon which relief may be granted."  A complaint fails to state a claim upon which relief may be granted where it does not allege sufficient facts which, taken as true, state a claim which is plausible on its face and thus does not raise a right to relief above the speculative level. *See Montoya v. FedEx Ground Packaging Sys. Inc.*, 614 F.3d 145, 149 (5th Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Although all well-pleaded facts are taken as true, the district court need not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions. *See Whatley v. Coffin*, 496 F. App'x 414 (5th Cir. Nov. 7, 2012) (citing *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). Crucially, while the federal pleading rules do not require "detailed factual allegations," the rule does "demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading offering "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice, nor does a complaint which provides only naked assertions that are devoid of further factual enhancement.  *Id*.

## VI. Discussion and Analysis

The Court understands that the crux of Paulson's case concerns TDCJ assigning him a "cool bed restriction" based on his medical history/disabilities and subsequent placement in 12 Building of the Michael Unit, which is administrative segregation, because of the "cool bed" assignment. Such placement, according to Paulson, prevented him from attending religious services and participating in programs such as the craft shop—specifically because of his medical

9

conditions. It also forced him to eat on the floor. The Court notes that Defendants' motion to dismiss does not seek the dismissal of Paulson's ADA and RLUIPA claims.

Moreover, the Court understands that Paulson alleges that the conditions inside his administrative segregation cell were "abhorrent," as his cell was overwhelmed with cockroaches and sometimes experienced water leaks, and that his placement there was without due process and presented an "atypical and significant hardship."

For reasons explained below, the Court recommends that Defendants' motion to dismiss, (Dkt. #79), be granted, in part, and denied in part. Specifically, the Court recommends that all of Paulson's claims should be dismissed for the failure to state a claim upon which relief may be granted—except for his RLUIPA and ADA claims against Defendants TDCJ and Collier, his First Amendment religion claim against Warden Townsend, and his Fourteenth Amendment Equal Protection claim against Wardens Boyd and Cueto. The Court will address each of Paulson's claims in turn.

A. First Amendment Religion Claim—Warden Townsend

Paulson asserts that Warden Townsend, in his individual capacity, deprived Plaintiff of his exercise of religious practices based on his disability. (Dkt. #67, pg. 14). Warden Townsend informed Paulson that he would not be allowed to attend his religious services because of his placement in Ad Seg for his cooling bed restriction. *Id*. Accepting his claims as true, Paulson has stated claim for the denial of his First Amendment rights.

Defendants do not address this First Amendment religion claim against Warden Townsend in their motion to dismiss. Although Defendants assert in their motion to dismiss an entitlement to qualified immunity using boiler-plate language, accepting Paulson's allegations as true, there are no facts showing that Warden Townsend's actions were objectively reasonable regarding the

denial of Paulson's First Amendment rights. Accordingly, Paulson's First Amendment religion claim against Warden Townsend survives Defendants' motion to dismiss and will remain pending.

Defendants, however, assert that Paulson's claims should be dismissed because he cannot show a physical injury pursuant to 42 U.S.C. § 1997e(e). Section 1997e(e) states, "No federal civil action may be brought by a prisoner ... for mental or emotional injury ... without a prior showing of physical injury." 42 U.S.C. ' 1997e(e). In *Geiger v. Jowers*, 404 F.3d 371, 375 (5th Cir. 2005), the Fifth Circuit held that, "Section 1997e(e) applies to *all federal civil actions* in which a prisoner alleges a constitutional violation, making compensatory damages for mental or emotional injuries non-recoverable, absent physical injury." *Geiger,* 404 F.3d at 375 (emphasis added). The Fifth Circuit further noted that Section 1997e(e) turns on the relief sought, *id.,* 404 F.3d at 375, and that the physical injury requirement does not bar declaratory or injunctive relief for violations of a prisoner's Constitutional rights. *See Harper v. Showers,* 174 F.3d 716, 719 (5th Cir. 1999); *see Hutchins v. McDaniels*, 512 F.3d 193, 196 (5th Cir. 2007) (per curiam); *Geiger,* 404 F.3d at 374.

In *Hutchins,* however, the Court "recognize[d] that § 1997e(e) does not bar [a prisoner]'s recovery of nominal or punitive damages." *Hutchins*, 512 F.3d at 198. Moreover, both nominal and punitive damages are recoverable in a civil rights action notwithstanding the absence of any entitlement to compensatory damages. *Boyd v. Driver*, 495 F. App'x 518, 524 (5th Cir. 2012) (quoting *Hutchins*, 512 F.3d at 197) ("[P]unitive damages may stand in the absence of actual damages where there has been a constitutional violation.") (quoting *Williams v. Kaufman Cnty.,* 352 F.3d 994, 1015 (5th Cir. 2003)); *Williams,* 352 F.3d at 1014 ("The law is well-established in this Circuit that plaintiffs may recover nominal damages when their constitutional rights have been violated but they are unable to prove actual injury."). Paulson's First Amendment religion claim survives Defendants' motion to dismiss.

B. Eighth Amendment—Property Claim—Defendant Brown

Paulson contends that Defendant Brown "initiated the destruction of [Paulson's] tools," economic loss. Paulson explains that Sanders[2], as the officer inside the craft shop at the Michael Unit, informed him that he could not attend the craft shop at the unit based on his medical restrictions. Pursuant to TDCJ policies, Paulson states, he lost or will lose thousands of dollars of his own tools due to nonattendance at the craft shop. In his response, (Dkt. #83), Paulson claims that his property was removed/destroyed by Defendant Brown "despite that the fact that it was contrary to TDCJ's own policies," and that the Defendant Brown did so knowing that it violated his rights and TDCJ policies.

Otherwise known as the *Parratt/Hudson* doctrine, the random, unauthorized, intentional, and even negligent deprivation of a property or liberty interest does not violate procedural due process if the State furnishes an adequate post-deprivation remedy. *See Caine v. Hardy*, 943 F.2d 1406, 1412 (5th Cir. 1991) (emphasis added); *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541-44 (1981). Before the doctrine can be applied, three pre-deprivation conditions must be met: (1) that the deprivation was predictable; (2) that the pre-deprivation process be impossible, making any additional safeguards useless; and (3) that the conduct of the state actor be unauthorized. When these conditions exist, the State cannot be required to do the impossible by providing a pre-deprivation process. *See Charbonnet v. Lee*, 951 F.2d 638, 642 (5th Cir. 1992); *Myers v. Klevenhagen*, 97 F.3d 91, 94–95 (5th Cir. 1996).

In other words, the deprivation of property by prison officials—even when negligent or intentional—does not violate the Due Process Clause of the Fourteenth Amendment provided that an adequate state post-deprivation remedy exists. *Hudson*, 468 U.S. at 533; *see also Simmons v.*

---

[2] The Court notes that the parties refer to Defendant Sanders and Defendant "Brown" in subsequent pleadings; the Court will defer to the amended complaint, operative pleading, (Dkt. #79).

*Poppell*, 837 F.2d 1243, 1244 (5th Cir. 1988) ("The Due Process Clause is not implicated by a state officials negligent act causing unintended loss of property.").

The Texas state judicial system provides an adequate state post-deprivation remedy. *See* Tex. Gov. Code Ann. Art. 501.007 (Vernon Supp. 1994); *see also Murphy Collins*, 26 F.3d 541, 543–44 (5th Cir. 1994) ("In *Hudson v. Palmer*, the Supreme Court held that deprivation of property caused by the misconduct of state officials does not infringe constitutional due process provided adequate state post-deprivation remedies exist. In Texas, as in many other states, the tort of conversion fulfills this requirement.").

Here, if Defendant Brown knowingly transferred, destroyed, or lost Paulson's personal property—contrary to TDCJ policies as Paulson repeatedly claims—then the deprivation of his property was necessarily a random, unauthorized act and, therefore, not a due process violation. *See, e.g.*, *Weeks v. Collier*, 2023 WL 7703823, *6 (5th Cir. 2023) (finding that the destruction of Week's craft shop materials was not a due process violation because it was the result of negligence rather than pursuant to prison policy). He describes the destruction or his property as an intentional act directly against TDCJ policy. Paulson had a post-deprivation remedy in state court, and his claims are meritless under *Parratt/Hudson*. Paulson's claim that Defendant Brown violated his constitutional rights through losing or destroying his personal property should be dismissed with prejudice.

C. Access to Courts

Next, Paulson insists that Defendant Townsend violated his rights to access the courts through the denial of legal materials and services and "restricting his access to the library and grievance system," (Dkt. #67, pg. 15). He elaborates by arguing that he was unable to prosecute his request for injunctive relief "quickly because of Defendant Townsend's interference with his

access legal materials, (Dkt. #83, pg. 3). A review of his motion for injunctive relief, (Dkt. #19), indicates that Paulson was permitting to order only nine legal citations per week, but had a 14-day deadline and that he sought more time in the law library for better research; his concern was late deadlines. *Id*. at pg. 2-3.

Prisoners have the constitutional right to access legal materials, and prison officials may not deny inmates access to courts. *See Clewis v. Hirsch*, 700 F. App'x 347, 348 (5th Cir. 2017) (citing *Bounds v. Smith*, 430 U.S. 817, 821 (1977)). As Defendants explain, however, there is no freestanding right to a law library or legal assistance. *Bounds*, 430 U.S. at 830; *see also Lewis v. Casey*, 518 U.S. 343, 351 (1996) ("Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.").

The Supreme Court has stated that this right to access courts encompasses no more than the ability of an inmate to prepare and transmit a *necessary* legal document to the court. *Id*. (citing *Brewer v. Wilkinson*, 3 F.3d 816, 821 (5th Cir. 1993) (internal quotations and footnote omitted)); *see also Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) (explaining that the right "encompasses only a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement.").

However, prisoners must demonstrate an actual injury to demonstrate a violation of this right. *Lewis*, 518 U.S. at 351; *see also Chriceol v. Phillips*, 169 F.3d 313, 317 (5th Cir. 1999) (explaining that the Supreme Court, in *Lewis*, "held that an inmate alleging denial of access to courts must demonstrate an actual injury stemming from defendants' unconstitutional conduct.").

When examining whether a plaintiff has experienced "actual injury," the Supreme Court has provided examples of circumstances that might show a denial of access to court:

> [The prisoner] might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered some arguably actionable harm that he wished to bring before the courts but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Lewis*, 518 U.S. at 351; *see also McIntosh v. Thompson*, 463 F. App'x 259, 260–61 (5th Cir. 2012) (unpublished) ("Even if McIntosh's constitutional rights had been restricted, he failed to allege sufficiently that he suffered an injury in fact, which is required to state a claim for denial of meaningful access to courts.").

Importantly, the question is whether the plaintiff's "position as a litigant was prejudiced" as a direct result of the alleged denial. *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996) (reasoning that "if Eason was pursuing a legal action which necessitated his use of the law library and access to the library was denied, this deprivation could represent a violation of his constitutional rights."); *Torres v. Bullock*, 2021 WL 2451326, at *4 (S.D. Tex. Apr. 6, 2021) ("In particular, to succeed on a claim of denial of access to courts, a plaintiff must show that he lost an actionable or nonfrivolous claim or was prevented from presenting such a claim because of the alleged denial.").

Here, Paulson alleges that he was prejudiced by the delay in prosecuting his motion for injunctive relief and claims that he was prejudiced by the delay because by the time he could prosecute his case, his requested relief was no longer needed because he had been transferred to a different prison unit, (Dkt. #83, pg. 3). The docket reflects that Paulson filed his motion for injunctive relief, while proceeding *pro se*, on February 26, 2022, (Dkt. #12). On Paulson's own motion, filed on August 18, 2022, he sought withdrawal of that motion because he had been

transferred—which was granted, (Dkt. #64). He has not articulated facts indicating how only nine citations per week was insufficient to litigate his claims before his transfer.

In his motion for injunctive relief, (Dkt. #12), Paulson sought additional or "full access" to the prison library and more than the permitted nine citations. He requested additional access "as other G-2" prisoners receive and complained that other TDCJ prisons "allow access daily to the unit law library"—as additional access would allow him to "present better researched, more understandable, and less time wasting [the court's] time in this suit." (Dkt. #12, pg. 2-3).

But a prisoner, no matter his classification, is not entitled to unfettered access to the prison's law library. *See Jones*, 188 F.3d 322, 325 (5th Cir. 1999) ("The right of access to the court does not afford prisoners unlimited access to prison law libraries."). Limitations may be placed on a prisoner's use of the law library—such as the amount of time a prisoner may attend and the number of legal materials he may possess—as long as those restrictions are reasonably related to legitimate penological interests.

Here, Paulson has not articulated facts suggesting that additional research or legal materials would have helped him succeed on his claims. *See Rosario v. Strawn*, 2022 WL 3151963, at *3 (3rd. Cir. Aug. 8, 2022) ("To the extent that this was an access-to-courts claim regarding his purported inability to access the law library in support of his criminal proceedings, he failed to identify a nonfrivolous or arguable legal claim he lost, or how more access to the law library would have changed the outcome of his criminal proceedings."). Paulson's insistence that he "was forced to endure inhumane conditions of administrative segregation for much longer than if he had been able to prosecute his request for a preliminary injunction," (Dkt. #83, pg. 4), is pure speculation.

Importantly, this right encompasses **only** the ability and opportunity to transmit documents to the court—and the record in this case alone reflects that Paulson was able to file numerous

pleadings throughout this proceeding—both prior to filing the motion for injunctive relief and before he filed his motion to withdraw. In other words, Paulson failed to articulate facts indicating that Defendants did not provide him a reasonably adequate opportunity to file nonfrivolous legal claims through his motion for injunctive relief that was ultimately withdrawn on his own motion. Paulson's claims for the violation of access to courts should be dismissed for the failure to state a claim.

D. Eighth Amendment—Conditions of Confinement

Paulson maintains that Defendants Townsend, Sanders, and Cueto violated his Eighth Amendment rights by housing him in administrative segregation, Building 12, with "deplorable" conditions. First, Plaintiff alleges that Townsend refused to remove him from restrictive housing., He also maintains the conditions inside his cell were deplorable—as he experienced water leaks, cockroaches, and infestations. Paulson also alleges that he was forced to eat on the floor at the Connolly unit at least one time.

It is well-settled that the treatment of inmates inside prisons and the conditions under which inmates are confined are subject to scrutiny under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993). The Eighth Amendment protects inmates from "the wanton and unnecessary infliction" of injury that results in "pain without any penological purpose" or an "unquestioned and serious deprivation of basic human needs." *See Gunther v. Dalton*, 396 F. App'x 105, 107 (5th Cir. 2010) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

While the Constitution does not mandate comfortable prisons, it does not permit inhumane ones. *See Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The Supreme Court characterized the constitutional requirements as follows:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his

> safety and general well-being. . . .  The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment...

*DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189 (1989). Courts examining prison conditions must measure the conditions against "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97 (1976).

To sustain a claim that conditions of confinement violate the Eighth Amendment, a prisoner must meet an objective and a subjective standard. When viewed objectively, the conditions must be serious enough to "deprive [a prisoner] of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Conditions that "cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id.*; *see also Alberti v. Klevenhagen*, 790 F.2d 1220, 1223 (5th Cir. 1986) ("Jail conditions must not fall below a minimum standard of decency required by the Eighth Amendment.").

Under the subjective component, the officials must act with a sufficiently culpable state of mind. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1981). A prison official may be held liable, nonetheless, only if he "ha[s] a sufficiently culpable state of mind," which, in context of prison conditions, is one of deliberate indifference to a prisoner's health and/or safety. *Torres*, 972 F.3d at 662 (quoting *Farmer*, 511 U.S. at 834). Deliberate indifference is an extremely high standard to meet: A prison official acts with deliberate indifference only if he (1) knows that the prisoner faces a substantial risk of serious bodily harm and (2) disregards that risk by failing to take reasonable measures to abate it. *Id.* at 663. In other words, a "deliberately indifferent state of mind requires that the official knows of an disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of

harm exists, and he must also draw the inference." *Williams v. Banks*, 956 F.3d 808, 811 (5th Cir. 2020). Negligence and even gross negligence will not suffice. *Torres*, 972 F.3d at 663.

Moreover, it is well-settled that—without more—the mere presence of insects or pests does not amount to a constitutional violation. *See Waller La. v. Ward*, 2016 WL 7235832, at *3 (W.D. La. Oct. 19, 2016) ("However, the mere presence of pests does not amount to a constitutional violation."). Similarly, living in a leaky cell with insects does not rise to the level of a constitutional violation—especially where, as here, there is no indication that he was harmed by the insects or the leaks. Paulson also states, with no elaboration, that he was "forced" to eat on the floor at the Connolly Unit, (Dkt. #84, pg. 15), and argues that it is an Eighth Amendment violation for him to do so. But Paulson provides no facts and no articulation of how eating on the floor physically harmed him—other than he "was not even afforded a place to eat." *See* Dkt. #83, pg. 15; Dkt. #67, pg. 8.

The Prison Litigation Reform Act bars federal lawsuits by prisoners seeking damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury." *Buchanan v. Harris*, No. 20-20408, 2021 WL 4514694, at *2 (5th Cir. Oct. 1, 2021) (quoting 42 U.S.C. § 1997e(e)). Here, in fact, as Defendants highlight, Paulson does not allege or articulate that he was physically harmed by the insects, leaks, or otherwise "deplorable" conditions inside administrative segregation. *See, e.g.*, *McClure v. TDCJ-CID*, 2011 WL 806227 *14 (E.D. Tex. Jan. 31, 2011) ("Instead, his pleadings depict an environment which is uncomfortable, unpleasant, and unquestionably stressful, but he has not shown that it is one which is unconstitutional.").

Rather, Paulson merely complains and repeats that he was forced to live inside a cell with many cockroaches and "often experienced water leaks," (Dkt. #67, pg. 7; Dkt. #83, pg. 4). Conclusory allegations such as these do not describe the physical harm stemming from the

cockroaches or the leaks—other than living in an uncomfortable environment—do not indicate that Paulson was deprived of the minimal civilized measure of life's necessities, and do not indicate that it is plausible that Defendants had subjective knowledge that Paulson "was exposed to cell conditions for s sufficient period of time that constituted an extreme deprivation or posed a serious risk to his health or safety." *Taylor v. Williams*, 715 F. App'x 332, 337 (5th Cir. 2017). Paulson's failure to allege how he was physically harmed by such "abhorrent" conditions is fatal to his Eighth Amendment claims. Likewise, Paulson articulates nothing signaling that he was housed in conditions resulting in an "unquestioned and serious deprivation of basic human needs." *Gunther*, 396 F. App'x at 107.

Paulson attempts to hold Defendant Townsend liable for his Eighth Amendment claims because Townsend "was specifically aware of [Paulson's] request to transfer from the abhorrent conditions in administrative segregation and refused, without any due process consideration of the deplorable conditions [Paulson] faced," (Dkt. #83, pg. 5). He notes that Townsend specifically "denied [his] request to be removed from restrictive housing." He also notes that Defendants Cueto and Boyd "were not only aware of the conditions but refused to correct them after Paulson complained." However, Paulson's insistence that Defendants were merely "aware" of the conditions but refused—without more—does not indicate that they had subjective knowledge of a substantial risk of harm. Paulson's claims under the Eighth Amendment should be dismissed.

E. Fourteenth Amendment—Due Process–Placement in Administrative Segregation

Paulson complains at length about the restrictions of his placement in administrative segregation, maintaining that it was an "atypical and significant hardship in relation to ordinary incidents of prison life."

Specifically, Paulson explains that he was denied medically assigned meals, remained in his cell for mostly 24 hours per day, and was permitted "limited trips outside his cell only to shower," (Dkt. #67). Paulson complains that he was not entitled to shower daily, that he was handcuffed while showering, and was not permitted to attend the chow hall like other prisoners because of his assignment to administrative segregation. Moreover, because he was assigned to administrative segregation, he was "denied access to the general library, law library, rehabilitation programs, and other privileges" available to other prisoners with his high status. He also states that his access to the grievance system was "limited," as he had to personally hand grievances to officers.

However, under a Fourteenth Amendment analysis, Paulson's brief stint in administrative segregation—even if he was given no formal hearing on his placement—does not indicate any atypical or significant hardship under the Fourteenth Amendment. A prisoner's placement in administrative segregation absent extraordinary circumstances is an incident to the ordinary life as a prisoner, and therefore will "never be a ground for a constitutional claim." *See Pichardo v. Kinker*, 73 F.3d 612, 612 (5th Cir. 1996). As the Fifth Circuit stated, "[s]olitary confinement is typically viewed as an ordinary, expected, and permissible incident of prison life." *Bailey v. Fisher*, 647 F. App'x 472, 474 (5th Cir. 2016). Assignment to administrative segregation can implicate a liberty interest, however, when it is utilized such that it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Wilkerson v. Goodwin*, 774 F.3d 845, 853 (5th Cir. 2014); *see also Tate v. Starks*, 44 F. App'x 720, 732-24 (5th Cir. 2011) (noting that extremely restrictive conditions constitute a "crucial exception to the general rule that a prisoner has no liberty interest in his classification.").

The Supreme Court has identified three relevant factors when examining the question of whether confinement in segregation is "atypical and significant": (1) the severity of the confinement restrictions; (2) the duration of the confinement in segregation; and (3) whether assignment to segregation has any collateral consequences on the prisoner's sentence. *See Wilkinson v. Austin*, 545 U.S. 209, 223–24 (2005); *Bailey v. Fisher*, 647 F. App'x 472, 475–76 (5th Cir. 2016). Courts have recognized that the severity of restrictions and duration as the two significant or key factors. *Wilkerson*, 774 F.3d at 854; *see also Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th 2013) ("In assessing whether disciplinary segregation amounts to a constitutional violation, this court looks to 'the combined import of the duration of the segregative confinement and the conditions endured.'").

In *Wilkinson*, the Supreme Court held that a prisoner's assignment to the Ohio Supermax facility entailed "highly restrictive conditions" of confinement, which gave rise to a liberty interest. 545 U.S. at 213. The Court highlighted that the Ohio Supermax—a maximum-security prison designed specifically to segregate the most dangerous prisoners from the general prison population—implemented more restrictive conditions than any other form of incarceration within Ohio, including conditions on its death row. *Id.* at 214.

The Court explained that "almost every aspect of an inmate's life is controlled and monitored" inside the facility, and cells within Ohio Supermax are 7 by 14 feet, and prisoners are confined inside their cells for 23 hours per day. *Id.* A light remains on inside the cell, "though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline." *Id.* The cells have solid metal doors with metal strips along the sides and bottoms to prevent communication and conversation with other prisoners. Prisoners receive their meals in

their cell as opposed to a "common eating area," and "[o]pportunities for visitation are rare and in all events are conducted through glass walls." *Id*. at pg. 214.

Moreover, during the one hour a prisoner is permitted to leave his cell, "access is limited to one of two indoor recreational cells." *Wilkinson*, 545 U.S. at 214. Placement at the Ohio Supermax is for an indefinite period of time—limited only by a prisoner's sentence, as for "an inmate serving a life sentence, there is no indication how long he may be incarcerated" at the prison once assigned there. *Id*. Parole-eligible prisoners lose their eligibility while incarcerated there. *Id*.

In finding that prisoners had a liberty interest in avoiding placement at the facility, the Court considered the totality of the circumstances imposed if assigned there—particularly focusing on the "severe limitations on all human contact," a prisoner's indefinite duration, and the disqualification of parole consideration if assigned there. *Id*. at 224 ("While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context.").

The Fifth Circuit visited this issue in *Wilkerson v. Goodwin*. 774 F.3d 845 (5th Cir. 2014). *Wilkerson* concerned a prisoner housed in solitary confinement for nearly thirty-nine years at Louisiana Penitentiary Angola (LSP). *Id*. at 848. The court highlighted the restrictive nature of confinement in segregation at LSP: confinement inside a cell alone for 23 hours per day, time for recreation and showers limited to one hour per day in isolated areas, significant limitations on human contact, and indefinite placement. *Id*. at 855. Considering the totality of the circumstances of the confinement, the Fifth Circuit held that the conditions were sufficiently severe to give rise to a liberty interest. *Id*. ("Here, however, we consider the 23-hour-a-day in cell isolation, limited physical exercise, and limited human contact, together with the extraordinary length of time . . . .

collectively, there can be no doubt that these conditions are sufficiently severe to give rise to a liberty interest.").

Recently, in terms of duration, the Fifth Circuit held that there is no threshold for atypicality. *See Carmouche v. Hooper*, 77 F.4th 362, 366 (5th Cir. 2023). The court essentially held that an analysis for atypicality varies, stating that "[d]istrict courts should apply a nuanced analysis looking at length and conditions of confinement on a case-by-case basis to determine whether they give rise to a liberty interest—not the application of a 30-month threshold."). *Id*. at 367; *see also Bailey*, 647 F. App'x at 476 (explaining that courts employ a "sliding scale").

### 1. Severity of the Restrictions

Paulson explains that he was denied medically assigned meals, remained in his cell for mostly 24 hours per day, and was permitted "limited trips outside his cell only to shower," (Dkt. #67). Paulson complains that he was not entitled to shower daily, that he was handcuffed while showering, and not permitted to attend the chow hall like other prisoners because of his assignment to administrative segregation. Moreover, because he was assigned to administrative segregation, he was "denied access to the general library, law library, rehabilitation programs, and other privileges" available to other prisoners with his high status. He also states that his access to the grievance system was "limited," as he had to personally hand grievances to officers.

First, the nature or severity of Paulson's confinement in administrative segregation at the Coffield Unit was not "atypical and significant" giving rise to a liberty interest. As explained, his claims concerning water leaks and insects do not demonstrate a constitutional violation.

Second, while Paulson explains that he was denied access to the general library and law library, his pleadings show that he was offered legal research, including citations. As previously

mentioned, his claim that he was denied access to the courts while in administrative fails to state a claim upon which relief may be granted.

Third, Paulson does not allege that he had no human contact while in restrictive housing. Likewise, even though he contends that he was denied recreational privileges, he elaborates no further. Such conclusory allegations—devoid of specifics and how he was physically harmed—are fatal to this first factor.

## 2. Duration of Placement in Restrictive Housing

Crucially and fundamentally fatal to Paulson's Fourteenth Amendment claims, unlike *Wilkerson* and *Wilkinson*, Paulson was not placed in restrictive housing indefinitely. *See Carmouche v. Hooper*, 77 F.4th 362, 367 (5th Cir. 2023) (explaining that "[d]istrict courts should apply a nuanced analysis looking at the length and conditions of confinement on a case-by-case basis to determine whether they give rise to a liberty interest."). Here, while he was proceeding *pro se*, Paulson explained that he arrived at the Michael Unit on Building 12 sometime in September 2021, (Dkt. #38, pg. 1). He was moved to the Connoly Unit sometime before August 2022—rendering Paulson's stay in administrative segregation inside the Michael Unit for approximately one year.

Federal courts are particularly concerned with indefinite placement in restrictive housing. *See, e.g.*, *Wilkinson*, 545 U.S. at 224; *Wilkerson*, 774 F.3d at 856 (explaining that solitary confinement at the prison was "effectively indefinite" as a result of "rote repetition"). The question becomes whether the reason a prisoner has been placed in segregation can change—or, stated differently, if the prisoner "has substantial influence over his length of stay in restrictive housing." *See Hernandez v. Abbott*, 2021 WL 11721407, at *10 (E.D. Tex. July 28, 2021) (highlighting that

the plaintiffs in *Wilkerson* were placed in restrictive housing for reasons that could never change: Their convictions of murdering a correctional officer and a fellow prisoner while in prison).

Here, the record is clear: Paulson's placement in administrative segregation at the Michael Unit was not indefinite. He was transferred to the Connolly Unit after approximately one year. While Paulson insists that he is still being "discriminated against" at the Connolly Unit by reason of his disabilities, such claim is properly suited for an ADA analysis. Because Paulson was not placed in administrative segregation indefinitely and for approximately one year—coupled with the insect infestations and water leaks failing to present a constitutional violation—the Court finds that he failed to state a claim under the Fourteenth Amendment that his placement in restrictive housing at the Michael Unit was "atypical and significant" giving rise to a liberty interest. This claim should be dismissed.

F. <u>Fourteenth Amendment—Equal Protection Claim</u>

Plaintiff asserted an equal protection claim in his amended complaint. He contends that "Wardens Boyd and Cueto violated his liberty rights by denying him access to the same opportunities as other inmates, such as equal recreation space and opportunities, and eating facilities." (Dkt. #67, pg. 15).

In order to establish a violation of the Equal Protection Clause, the plaintiff "must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from discriminatory intent." *See Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001); *see also Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012) ("To establish an equal protection claim, Gallegos must show that two or more classifications of similarly situated persons were treated differently.").

Here, Defendants do not address Paulson's Equal Protection claim against Wardens Boyd and Cueto in their motion to dismiss. As such, the claim will remain pending before the Court. Accepting Paulson's allegations as true, which the Court is required to do at this stage, there are no facts showing that Wardens Boyd and Cueto's actions were objectively reasonable regarding the denial of Paulson's Equal Protection rights. As such, Paulson's Fourteenth Amendment Equal Protection claim against Wardens Boyd and Cueto survive Defendants' motion to dismiss and remains pending on the docket.

As discussed above, the failure to allege a physical injury is not deleterious to Paulson's claims. The physical injury requirement of section 1997e(e) does not bar declaratory or injunctive relief for violations of a prisoner's Constitutional rights. *See Harper,* 174 F.3d at 719; *see Hutchins*, 512 F.3d at 19); *Geiger,* 404 F.3d at 374. Moreover, both nominal and punitive damages are recoverable in a civil rights action notwithstanding the absence of any entitlement to compensatory damages. *Boyd v. Driver*, 495 F. App'x 518, 524 (5th Cir. 2012) (quoting *Hutchins*, 512 F.3d at 197) ("[P]unitive damages may stand in the absence of actual damages where there has been a constitutional violation.") (quoting *Williams v. Kaufman Cnty.,* 352 F.3d 994, 1015 (5th Cir. 2003)); *Williams,* 352 F.3d at 1014 ("The law is well-established in this Circuit that plaintiffs may recover nominal damages when their constitutional rights have been violated but they are unable to prove actual injury."). Paulson's Fourteenth Amendment Equal Protection claim survives Defendants' motion to dismiss.

G. Americans with Disabilities Act

Plaintiff insists that he is being discriminated against by reason of his medical conditions/disabilities by virtue of TDCJ's "cool bed restriction" policy.

As an initial matter, neither the ADA nor the RA permit individual capacity claims or damages. *See* 42 U.S.C. §§ 1213(1)(B), 12132 (defining public entity to only include "any department, agency, … or other instrumentality of a State); *Martinez v. City of Buda, Tex.*, 2018 WL 837609, at *6 (W.D. Tex. Feb. 13, 2018) (collecting cases holding that individual defendants cannot be sued for violating the ADA); *Lollar v. Baker*, 196 F.3d 603, 609 (5th Cir. 1999). Therefore, to the extent that Paulson sues any state official in an individual capacity, such claim should be dismissed.

The ADA and the RA are judged and evaluated under the same legal standards, and the same remedies are available under both. *Valentine*, 993 F.3d at 289 (citing *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010)). To show discrimination under the ADA, a plaintiff must prove:

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Id.*; *see also Smith v. Harris Cnty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020). The Supreme Court has held that modern prisons conduct many "services, programs, or activities" that confer "benefits" on prisoners—such as recreational activities, medical services, and vocational programs. *Pa. Dep't. of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

Moreover, the ADA and RA "impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennet-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). In order to prevail on a claim concerning alleged failure to accommodate, the plaintiff must prove (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations. *See Smith*, 956 F.3d at 317 (citing *Ball*, 792 F.3d at

596).  The entity must understand the limitations a plaintiff experienced as a result of his disability; the burden is on the plaintiff to identify the disability, the limitation, and to request accommodation in "direct and specific" terms. *See Valentine*, 993 F.3d at 290;

Even if a plaintiff demonstrates the failure to accommodate, or even disability-discrimination, he must show intentional discrimination. *See Smith*, 956 F.3d at 318. Deliberate indifference does not suffice. *Id.*; *see also Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 575 (5th Cir. 2002) ("[I]n order to receive compensatory damages for violations of the Acts, a plaintiff must show intentional discrimination."); *Douthit*, 2022 WL 5249152, at *2 ("To recover compensatory damages under the ADA, a plaintiff must make a showing of intentional discrimination.")

Here, Paulson maintains that he was placed under TDCJ's "cool bed policy" restriction because of his disabilities connected with his medical conditions, which resulted in his placement on the 12 Building at the Michael Unit. He claims that as a result of being on 12 Building (administrative segregation), he was unable to attend religious services and rehabilitation/educational programs—particularly the craft shop. Paulson pleads that Defendant Sanders/Brown specifically remarked that "he would not be permitted to attend the craft shop based on his restrictions," (Dkt. #67, pg. 7), and that Defendant Townsend "specifically informed [Paulson] that he would not be permitted to access religious services, he would not be able to attend the craft shop, and would be subject to restrictive housing policies of TDCJ because of the cool-bed restriction. *Id.* at pg. 14.

Paulson remarks that he is a qualified individual with a disability, had a history of physical or mental impairments that substantially limit one or more major life activities, and is regarded as so. He insists that he is being treated differently than a non-disabled prisoner under the same circumstances. Paulson insists that TDCJ failed—but can—make reasonable accommodations to

its "cool bed" restriction. For example, he cites how TDCJ can escort him to educational and religious programs or the shower. It could also house him in another building altogether.

The Court determines that these articulated facts state a claim for a potential ADA violation against TDCJ and Bryan Collier. He has pleaded that he has a qualified disability, (2) that he is being excluded from participation and denied benefits of services and programs, and (3) that the reason for such is because of his disabilities because of the cool-bed restriction. These claims will proceed before the Court.

H. RLUIPA

The Court similarly determines that Paulson stated a claim under RLUIPA. RLUIPA provides, in relevant part, that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  RLUIPA defines "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §2000cc-5(7)(A).

In enacting RLUIPA, Congress did not authorize the payment of damage awards to prevailing plaintiffs under the statute. 42 U.S.C. §§ 2000cc, *et seq*. RLUIPA authorizes only injunctive relief. Additionally, RLUIPA does not waive the state's Eleventh Amendment immunity, and accordingly, monetary damages are not available for claims brought against state officials under RLUIPA. *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 335 (5th Cir. 2009),

*aff'd sub. nom.*, *Sossamon v. Texas*, 563 U.S. 277 (2011). Additionally, nominal damages are also considered to be compensatory in nature, and not an equitable remedy. *Landgraf v. USI Film Prod.*, 968 F.2d 427, 431 (5th Cir. 1992).

Under RLUIPA, the plaintiff carries an initial burden to show that the challenged law, regulation, or practice substantially burdens the exercise of his religion. *See Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004) ("Initially, if falls to the plaintiff to demonstrate that the government practice complained of imposes a substantial burden on his religious exercise."). If the plaintiff carries his burden, then the government bears the burden of persuasion that application of its substantially burdensome practice is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *Id.* at n. 32. While the statute does not define "substantial burden," the Fifth Circuit defined the term as follows:

> [A] government action or regulation creates a "substantial burden" on religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs …. [T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following is religious beliefs.

*Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 613 (5th Cir. 2008) (citing *Adkins*, 393 F.3d at 570).

As a matter of law, RLUIPA does not create a cause of action against defendants in their individual capacities. *See Sossaman*, 560 F.3d at 331; *Copeland v. Livingston*, 464 F. App'x 326, 330 (5th Cir. 2012) (unpublished) (explaining that "RLUIPA does not create a provide right of action against individuals for damages."). Damages are also not available under RLUIPA against any defendants—as state actors—in their official capacities. *See Sossaman v. Texas*, 563 U.S. at 280.

Here, Paulson explains that he has sincerely held religious beliefs, as he has been a member of the Navajo Nation since the 1960s. Throughout his incarceration at TDCJ, he routinely attended religious services—except when he was transferred to the Michael Unit in 2021 based on the cool-bed policy that landed him in restrictive housing. Paulson claims that he has been unable to attend religious programming at the Michael Unit—and that both the cool-bed restriction and the restrictive housing policy substantially burden his religious exercise. Paulson maintains that the policies are not the least restrictive means because, in part, TDCJ could adopt policies that "do not automatically characterize inmates as cool bed restricted without medical need" or "allow prisoners to attend services and other opportunities while in ad seg," (Dkt. #67, pg. 11). Paulson's allegations here state a claim for relief under RLUIPA and will proceed before the Court.

I. Qualified Immunity

In their motion to dismiss, Defendants argue they are entitled to qualified immunity. To demonstrate the inapplicability of the qualified immunity defense, the plaintiff must satisfy a two-prong test. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  The first prong is whether "the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of [constitutional or] federal law." *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (citation omitted). The second is "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004) (citations omitted).  A court may consider the two-pronged inquiry in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Defendants are entitled to qualified immunity at the motion-to-dismiss stage unless the plaintiffs have alleged facts sufficient to plausibly show that (1) the defendant's conduct violated

a constitutional right and (2) the constitutional right was clearly established at the time of the alleged misconduct. *See Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1163 (5th Cir. 2021).

Here, as explained above, Paulson failed to state a claim upon which relief may be granted with respect to his claims for the denial of access to courts, his conditions of confinement, his placement in restrictive housing, and his property claims. For those claims, the first prong of the qualified-immunity analysis necessarily fails. Because Paulson has not satisfied the first prong for those specific claims, an analysis of the second is unnecessary and Defendants are entitled to qualified immunity concerning the allegations for which Paulson states no claim upon which relief may be granted.

Conversely, Defendants are not entitled to qualified immunity at this stage of the proceedings concerning Paulson's RLUIPA claim, his First Amendment religion claim, his ADA/RA claims, and his Equal Protection claims.

## V. Conclusion

A review of Paulson's pleadings and Defendants' motions to dismiss reveal that Paulson stated a claim upon which relief may be granted with respect to his RLUIPA claim, his First Amendment religion claim, his ADA/RA claims, and his Equal Protection claims under the Fourteenth Amendment. These claims will proceed before the Court.

Conversely, Paulson has not stated a claim upon which relief may be granted regarding his claims for the denial of access to courts, his conditions of confinement under the Eighth Amendment, his placement in restrictive housing under the Fourteenth Amendment, or his property claims. Those claims should be dismissed.

## RECOMMENDATION

For the foregoing reasons, it is recommended that Defendants' motions to dismiss, (Dkt. #79), be granted, in part, and denied in part. Plaintiff's claims concerning access to courts, property, his conditions of confinement, and restrictive housing should be dismissed for the failure to state a claim upon which relief may be granted. The remaining claims should proceed.

Within fourteen (14) days after receipt of the magistrate judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court.  *Douglass v. United Servs. Auto Ass'n.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

So ORDERED and SIGNED this 23rd day of July, 2024.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE